## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

_Jacksonville_ Division

2008 JUN -5  PM 1:18

_____
JACKSONVILLE, FLORIDA

### CIVIL RIGHTS COMPLAINT FORM

_MR. WATSON, TYSON N._

CASE NUMBER: _3:08-cv-567-J-33 MCR_
(To be supplied by Clerk's Office)

_____

(Enter full name of each Plaintiff and prison number, if applicable)

v.

_MR. DECKER, PAUL C._
_MR. HICKS, M._
_MR. SWAIN, SHAWN_
_MR. SLOAN_

(Enter full name of each Defendant. If additional space is required, use the blank area directly to the right).

_MR. JILL (JOHN DOE)_
_MR. BRADEN, DAVID_
_MR. NAPIER_
_MR. ROBINSON_
_MR. HARPER_
_MR. WALKER_
_MR. DAVIS, JERRY_
_MR. GAVRIELLE (JOHN DOE)_
_MR. LEE_

### ANSWER ALL OF THE FOLLOWING QUESTIONS:

I.   PLACE OF PRESENT CONFINEMENT: _Union Correctional Institution;_
(Indicate the name and location)

_7819 N.W. 228th. Street; Raiford, Florida 32026_

II.  DOES YOUR COMPLAINT CONCERN EVENTS IN A STATE PRISON FACILITY WITHIN THE FLORIDA DEPARTMENT OF CORRECTIONS? Yes (✓) No ( )

[If your answer is YES, after reviewing the exhaustion requirements, answer the following questions]

Defendants', continued:

MR. NEWELL
MR. WHEELER, RANDALL
MR. JOHNSON, SEAN J.

EXHAUSTION OF ADMINISTRATIVE REMEDIES: Pursuant to the Prison Litigation Reform Act or 1995, Title VIII, Section 803 Amendments to Civil Rights of Institutionalized Persons Act, exhaustion of administrative remedies is required in any action brought with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility. Any required grievances, appeals, and responses must be submitted to the Court to verify exhaustion. (If your Complaint concerns conditions at state prison facilities, you must answer the following questions in Section II of this form. If the Complaint concerns conditions at a county jail or local correctional facility, you must complete Section III of this form.)

EXHAUSTION STEPS ORDINARILY REQUIRED FOR COMPLAINTS ABOUT CONDITIONS AT STATE PRISON FACILITIES:

General Grievance

1.  Informal Grievance (Form DC3-005)
2.  Formal Grievance (Form DC1-303)
3.  Appeal to the Office of Secretary (Form DC1-303)

Other Grievance

Inmates are not required to utilize the informal Grievance process in the case of an emergency grievance, a grievance of reprisal, a grievance of a sensitive nature, a grievance alleging violation of the Americans with Disabilities Act, a medical grievance, a grievance involving admissible reading material, a grievance involving gain time governed by rule 33-11.0065 Incentive Gain Time, or a grievance involving disciplinary action (does not include corrective consultations) governed by chapter 33-22. The grievance steps are set forth in Fla. Admin. Code Chapter 33-29.

Questions:

A.  Emergency Grievance, Grievance of Reprisal, or Grievance of a Sensitive Nature, Grievance Alleging Violation of the American with Disabilities Act, Medical Grievance, Grievance, Grievance Involving Admissible Reading Material, Grievance Involving Gain Time Governed by Rule 33-11.0065 Incentive Gain Time, or Grievance Involving Disciplinary Action Governed by Chapter 33-22 (Request for Administrative Remedy or Appeal, bypassing the informal grievance step).

1.  Did you submit an above-mentioned grievance to the Superintendent and/or to the office of Secretary (Form DC1-303)? Yes (✔) No ( )

2.  If so, you must attach a copy of the grievance and response to this Complaint form.

3.  Were you denied emergency status? Yes ( ) No (✔)

    a.  If so, did you go through the informal grievance, formal grievance and appeal process? Yes ( ) No ( )

    b.  If so, you must attach copies of the grievance/appeals and responses to this Complaint form.

B.  Informal Grievance (Request for Interview)

1. Did you submit an informal grievance (Form DC3-005)? Yes (✓) No (  )

2. If so, you must attach a copy of the grievance and response to this Complaint form.

C.   <u>Formal Grievance</u> (Request for Administrative Remedy or Appeal)

1. Did you have a disciplinary hearing concerning this matter? Yes (  ) No (✓)

2. If so, you must attach a copy of the disciplinary report and disciplinary committee's findings and decision to this Complaint form.

3. Did you submit a formal grievance (Form DC1-303)? Yes (✓) No (  )

4. If so, you must attach a copy of the grievance and response to this Complaint form.

D.   <u>Appeal to the Office of the Secretary</u> (Request for Administrative Remedy or Appeal)

1. Did you submit an appeal to the Office of the Secretary (Form DC1-303)? Yes (✓) No (  )

2. If so, you must attach a copy of the appeal and response to this Complaint form.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING ANSWERS TO THE QUESTIONS IN THIS SECTION ARE TRUE AND CORRECT.

Signed this __2nd__ day of __June_____, 2 _008_____.

_Tyson Nathaniel Watson_ ✗✗
Signature of Plaintiff

III.   DOES YOUR COMPLAINT CONCERN EVENTS IN A COUNTY JAIL OR LOCAL FACILITY? Yes ( ) No (✔)

If your answer is YES, answer the following questions.

A.   Is there a grievance procedure at your institution or jail? Yes ( ) No ( )

B.   Did you present the facts relating to your Complaint in the grievance procedure? Yes ( ) No ( )

C.   If your answer is YES:

1.   What steps did you take? _____

_____

2.   What were the results? _____

_____

3.   To demonstrate exhaustion, you must submit copies of all relevant grievances/appeals and responses.

D.   If your answer is NO, explain why not: _____

_____

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING ANSWERS TO THE QUESTIONS IN THIS SECTION ARE TRUE AND CORRECT.

Signed this _2nd_ day of _June_, 2_008_.

_Tyson Nathaniel Watson_ ⚡
Signature of Plaintiff

IV.   PREVIOUS LAWSUITS:

A.   Have you initiated other lawsuits in state court dealing with the same or similar facts involved in this action or otherwise relating to your imprisonment or conditions thereof? Yes ( ) No (✔)

B.   Have you initiated other lawsuits in federal court dealing with the same or similar facts involved in this action or otherwise relating to your imprisonment or conditions thereof? Yes ( ) No (✔)

C.   If your answer to either A or B is YES, describe each lawsuit in the space provided below. If there is more than one lawsuit, describe all additional lawsuits on a separate piece of paper, using the same format as below.

1.   Parties to previous lawsuit:

Plaintiff(s): _____

_____

Defendant(s): _____

_____

2.   Court (if federal court, name the district; if state court, name the county):

_____

3.   Docket Number: _____

4.   Name of judge: _____

5.   Briefly describe the facts and basis of the lawsuit: _____

_____

_____

6.   Disposition (Was the case dismissed? Was it appealed? Is it still pending?):

_____

_____

7.   Approximate filing date: _____

8.   Approximate disposition date: _____

D.   Have you initiated lawsuits or appeals from lawsuits in federal court that have been dismissed as frivolous, malicious or for failure to state a claim upon which relief may be granted? If so, identify theses suits below by providing the case number, the style, and the disposition of each case:

_____

_____

_____

_____

V.  **PARTIES**:  In part A of this section, indicate your <u>full name</u> in the first blank and your full mailing address in the second blank.  Do the same for each additional Plaintiff named in the Complaint (if any) in part B of this section:

A.  Name of Plaintiff: _Mr. Tyson Nathaniel Watson D.C. # C-195947_

Mailing address: _Union Correctional Institution_

_7819 N.W. 228th Street    ;   Raiford, Florida  32026_

B.  Additional Plaintiffs: _____ , _____

_____

_____

In part C of this section, indicate the <u>**full name**</u> of the first named Defendant.  Also, fill in his or her mailing address, position, and where he or she is employed.  For any additional Defendants, use parts D through ❾ of this section for the names, addresses, positions and places of employment:

C.  Defendant:  _Mr. Paul C. Decker_

Mailing Address:  _2601 Blairstone Road_

_Tallahassee, Florida  32399_

Position:  _Inspector General_

Employed at:  _Florida Department of Corrections_

D.  Defendant:  _Mr. M. Hicks    (First name unknown)_

Mailing Address:  _7819 N.W. 228th Street_

_Raiford, Florida  32026_

Position:  _Warden_

Employed at:  _Union Correctional Institution_

E. Defendant: Mr. Shawn Swain

Mailing Address: 7819 N.W. 228th. Street

Raiford, Florida 32026

Position: Correctional Lieutenant

Employed at: Union Correctional Institution

F. Defendant: Mr. Sloan (First name unknown)

Mailing Address: 7819 N.W. 228th. Street

Raiford, Florida 32026

Position: Correctional Officer

Employed at: Union Correctional Institution

G. Defendant: Possibly Mr. Jill (First name unknown) (JOHN DOE)

Mailing Address: 7819 N.W. 228th. Street

Raiford, Florida 32026

Position: Correctional Officer

Employed at: Union Correctional Institution

H. Defendant: Mr. David Braden

Mailing Address: 7819 N.W. 228th. Street

Raiford, Florida 32026

Position: Correctional Officer

Employed at: Union Correctional Institution

Defendants, continued on 7-A - 7

DC 225 (Rev. 9/03)

7

I I. Defendant: _Mr. Napier (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Sergeant_

Employed at: _Union Correctional Institution_

J I. Defendant: _Mr. Robinson (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Sergeant_

Employed at: _Union Correctional Institution_

K I. Defendant: _Mr. Harper (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Sergeant_

Employed at: _Union Correctional Institution_

L. Defendant: _Mr. Walker (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Officer_

Employed at: _Union Correctional Institution_

M #. Defendant: _Mr. Jerry Davis_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Officer_

Employed at: _Union Correctional Institution_

N #. Defendant: _Mr. John Doe_ (_Possibly Mr. Gamielle, but First and last names unknown_)

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Sergeant_

Employed at: _Union Correctional Institution_

O #. Defendant: _Mr. Lee (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Officer_

Employed at: _Union Correctional Institution_

P. Defendant: _Mr. Newell (First name unknown)_

Mailing Address: _7819 N.W. 228th. Street_

_Raiford, Florida 32026_

Position: _Correctional Lietitenant_

Employed at: _Union Correctional Institution_

Q. Defendant: Mr. Wheeler, Randall
   Mailing Address: 7819 N.W. 228th. Street
   Raiford, Florida 32026
   Position: Correctional Sergeant
   Employed at: Union Correctional Institution

R. Defendant: Mr. Johnson, Sean J.
   Mailing Address: 7819 N.W. 228th. Street
   Raiford, Florida 32026
   Position: Correctional Officer
   Employed at: Union Correctional Institution

7C

VI.   STATEMENT OF CLAIM:  State what rights under the Constitution, laws, or treaties of the United States have been violated, and be specific.  If you intend to allege a number of related claims, set forth each claim in a separate paragraph.  Any claim that is not related to the same basic incident or issue must be addressed in a separate Civil Rights Form.

Each defendant is being sued individually and in their official capacities. At all times mentioned in this complaint each defendant acted under the color of state law. Plaintiff realleges and incorporates by reference the statement of facts in section VII of this complaint.

Statement of Claim continued on page 8A-8E.

VII.  STATEMENT OF FACTS:  State as briefly as possible the FACTS of your case. Describe how each defendant was involved.  **Do not make any legal arguments or cite any cases or statutes.**  State with as much specificity as possible the facts in the following manner:

1.   Name and position of person(s) involved.
2.   Date(s).
3.   Place(s).
4.   Fact(s) or event(s) giving rise to your claim, including involvement of each defendant.
5.   Nature and extent of injury (i.e., physical injury or how you were harmed by the acts of the defendant(s)).

Each defendant acted in their individual and official capacity. At all times mentioned in this complaint each defendant acted under the color of state law.

Since approximately the age of eight the plaintiff received treatment by mental health providers to meet the serious needs of plaintiff's mental disability. On a continuous basis this mental health care has included psychotropic medications, group therapy and individualized counselling with a psychological specialist, mostly within inpatient, residential facilities.

Since being diagnosed with the mental illness: Bipolar disorder (a mood disorder usually caused by a chemical imbalance inside the brain) in 1996 by

<u>Defendant, Mr. Paul C. Decker</u> is the Inspector General, head of the Office of the Inspector General within the Florida Department of Corrections of the state of Florida.

He is legally responsible for the overall operation of investigations of the Department and each institution under its jurisdiction, including Union Correctional Institution where the plaintiff is confined.

Defendant Decker's deliberate indifference to dangerous conditions where the plaintiff was confined violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prison condition that exposes a prisoner to an unreasonable risk of serious harm. <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993).

Prison officials act with deliberate indifference when they ignore an obvious and serious danger. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). Exposure to abusive officers presents an unreasonable risk of serious harm.


<u>Defendant, Mr. M. Hicks</u> (First name unknown) is the Warden of Union Correctional Institution. He is legally responsible for the operation of Union Correctional Institution and for the welfare of all the inmates of this institution, including the plaintiff who is a patient at the Transitional Care Unit inpatient mental health program.

Defendant Hicks' deliberate indifference to dangerous conditions and unreasonable risk of obvious and serious harm where plaintiff was confined, and to plaintiff's serious mental health needs violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution;

and constituted discrimination against a mentally disabled prisoner under the Americans with Disabilities Act of 42 U.S.C. §§ 12101-12213 and

Title II of the Americans with Disabilities Act, Section 504 of the Rehabili-
tation Act of 1973.

Mental health concerns qualify as serious medical needs when a risk of
suicide exists. <u>Estate of Cole by Pardue v. Fromm</u>, 94 F.3d 254 (7th. Cir. 1996);
<u>Gregoire v. Class</u>, 236 F.3d 413 (8th. Cir. 2000).

Prisons are required to provide rehabilitative programs to mentally ill
prisoners. <u>Women Prisoners of District of Columbia Department of Corrections v.
District of Columbia</u>, 93 F.3d 910, 927 (D.C. Cir. 1996).


<u>Defendant, Mr. Shawn Swain</u> is a Correctional Lieutenant of the Florida
Department of Corrections who, at all related times mentioned in this complaint,
held this same rank and was assigned to U and/or V dormitories of the
Transitional Care Unit at Union Correctional Institution as the officer in
charge over the Bravo shift, where the plaintiff was confined.

Defendant Swain's malicious use of excessive force to cause harm
violated plaintiff's rights, and constituted cruel and unusual punishment un-
der the Eighth Amendment of the United States Constitution. <u>Hudson v.
McMillian</u>, 503 U.S. 1 (1992);

and also constituted deprivation of plaintiff's rights under the color
of law, under the Civil Rights section of the Federal Rules of Criminal Pro-
cedure. 18 U.S.C. §242 ; <u>United States v. Miller</u>, 477 F.3d 644 (8th.
Cir. 2007); and constituting criminal violation of plaintiff's Eighth Amend-
ment rights under 18 U.S.C. §242.


<u>Defendant, Mr. Sloan</u> (First name unknown) is a Correctional Officer of the
Florida Department of Corrections who, at all related times mentioned in this complaint,
held this same rank and was assigned to V-dormitory of the Transitional Care
Unit at Union Correctional Institution during the Admit/Bravo shift where

the plaintiff was confined.

Defendant Sloan's malicious use of excessive force to cause harm violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Hudson v. McMillian, 503 U.S. 1 (1992);

and also constituted deprivation of plaintiff's rights under the color of law, under the Civil Rights section of the Federal Rules of Criminal Procedure; and also constituted a criminal violation of plaintiff's Eighth Amendment rights under 18 U.S.C. § 242. United States v. Miller, 477 F.3d 644 (8th. Cir. 2007).


Defendant, Mr. John Doe ( Upon information and belief: possibly Mr. Jill; first name unknown ) is a Correctional Officer of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank and was assigned at Union Correctional Institution where the plaintiff was confined.

Defendant Doe's malicious use of excessive force to cause harm violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Hudson v. McMillian, 503 U.S. 1 (1992);

and also constituted deprivation of plaintiff's rights under the color of law, under the Civil Rights section of the Federal Rules of Criminal Procedure; and also constituted a criminal violation of plaintiff's Eighth Amendment rights under 18 U.S.C. § 242. United States v. Miller, 477 F.3d 644 (8th. Cir. 2007).


Defendant, Mr. David Braden is a Correctional Officer of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank and was assigned to Union Correctional Institution during the Bravo shift where the plaintiff was confined.

Defendant Braden's deliberate depriving of property violated plaintiff's

8C

rights, and constituted a denial of due process of law under the Fourteenth Amendment of the United States Constitution.

Defendant, Mr. Napier (First name unknown) is a Correctional Sergeant of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank and was assigned at Union Correctional Institution during the Bravo shift where the plaintiff was confined.

Defendant Napier's deliberate depriving of property violated plaintiff's rights, and constituted a denial of due process of law under the Fourteenth Amendment of the United States Constitution.

Defendant Mr. Robinson (First name unknown) is a Correctional Sergeant.

Defendant Mr. Harper (First name unknown) is a Correctional Sergeant.

Defendant Mr. Walker (First name unknown) is a Correctional Officer.

Defendant Mr. Jerry Davis is a Correctional Officer.

Defendants' Robinson, Harper, Walker and Davis are of the Florida Department of Corrections who, at all related times mentioned respectively, in this complaint, held their same ranks and were assigned at Union Correctional Institution where the plaintiff was confined.

Defendants' Robinson, Harper, Walker and Davis malicious use of excessive force to cause harm violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

_Defendant, Mr. John Doe_ ( Upon information and belief: possibly Mr. Gavrielle; first name unknown) is a Correctional Sergeant.

_Defendant, Mr. Lee_ (First name unknown) is a Correctional Officer.

Defendants Doe and Lee are of the Florida Department of Corrections both who, at all related times mentioned in this complaint, held their same ranks and were assigned to U-dormitory during the Charlie shift at Union Correctional Institution where plaintiff was confined.

Defendants' Doe and Lee deliberate indifference to dangerous conditions where the plaintiff was confined violated plaintiff's rights, and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

Exposure to violent, unstable inmate presents an unreasonable risk of serious harm.

_Defendant, Mr. Newell_ (First name unknown) is a Correctional Lieutenant.
_Defendant, Mr. Randall Wheeler_ is a Correctional Sergeant.
_Defendant, Mr. Sean J. Johnson_ is a Correctional Officer.

Defendants' Newell, Wheeler and Johnson are of the Florida Department of Corrections. At all related times mentioned they held their same rank and were assigned at Union Correctional Institution where plaintiff was confined when these defendants maliciously used excessive force to cause harm and violated plaintiff's rights against cruel and unusual punishment under the Eighth Amendment of the United States Constitution, and deprived his rights under color of law, under 18 U.S.C. §242.

Statement of Facts, continued:

the prison psychiatrist at Zephyrhills Correctional Institution's Transitional Care Unit inpatient mental health program, plaintiff began receiving a psychotropic medication, called Lithium, as his primary medication.

Since plaintiff has been receiving treatment for his mental illnesses over more than twenty years, mental health staff have encouraged plaintiff to take advantage of alternative treatments, including activity therapy, individual counseling and group behavior therapy which are a necessary part of plaintiff's mental health treatment.

When made reasonably available plaintiff has usually participated actively in these alternative treatments to his psychotropic medication and his mental health has, resultingly, improved.

On April 6, 2007, after repeated evaluations by the psychiatrist, Doctor Springer, at Florida State Prison, Dr. Springer decided the plaintiff required inpatient treatment at a Transitional Care Unit to meet his serious mental health needs.

Plaintiff was admitted to the Transitional Care Unit inpatient program (herein referred to as T.C.U.) at Union Correctional Institution, on April 9, 2007, by the doctor's recommendation and order to begin treatment necessary to address his serious mental health needs.

Plaintiff was initially placed in housing unit V-dormitory at Union C.I., a designated T.C.U. dormitory. There, plaintiff was encouraged by psychological specialist Mrs. Bartholomew to take advantage of the group and individual therapies.   (Statement of Facts, continued on page 9A-9Z)

Statement of Facts, continued:

These alternative treatments were reasonably accessible, and not yet interferred with at the time by security staff.

However, shortly thereafter, plaintiff began to experience physical abuse and threats by security staff in V-dormitory during same shift of Bravo that alternative treatments were offered by mental health staff.

Plaintiff was endangered to further abuse if he tried to access the out-of-cell alternative treatments by first being handcuffed by security staff who'd then enter his cell in order to place leg restraints on plaintiff kneeling on the bottom bunk while no witnesses or fixed position wall mounted security camera could see in. Plaintiff could easily be assaulted there.

Plaintiff already received threats by security staff of such abuse, and upon information and belief, other patients in T.C.U. were abused the same way. For abusive staff, areas with no cameras or witnesses were ideal and preferrable to abuse patients. Thus, threatened patients usually feared these sorts of areas, which were called "blind spots."

Because of the unreasonable risk of serious harm by security staff, plaintiff was denied access to the alternative treatments.

Plaintiff filed grievance to complain that plaintiff was deprived access to mental health alternative treatment, requesting to be relocated to another T.C.U. dorm or location where plaintiff would have unhindered access.

Grievance was filed to Defendant, Mr. M. Hicks (First name unknown), who is the Warden of Union C.I. He is legally responsible for the operation of Union C.I. and for the welfare of all inmates of the institu-

Statement of Facts, continued:



tion, including the plaintiff who is a patient at the T.C.U. inpatient mental health program.

However, defendant Hicks failed to actively address these concerns, nor respond reasonably in order to ensure plaintiff's access to alternative treatment were not interferred with. Defendant Hicks' failure also affected the plaintiff's mental health seriously, injuring the plaintiff psychologically.

During the middle of 2007, as the threats continued, plaintiff was further threatened with bodily harm by Defendant, Mr. Shawn Swain and Defendant, Mr. Sloan (First name unknown).

Defendant Swain is a Correctional Lieutenant of the Florida Department of Corrections who, at all times mentioned in this complaint, held this same rank and was assigned to U and/or V dormitories in T.C.U. at Union C.I. as the Officer In Charge over the Bravo shift, where the plaintiff was confined.

Defendant Sloan is a Correctional Officer of the Florida Department of Corrections who, at all times mentioned in this complaint, held this same rank and was assigned to V dormitory in T.C.U. at Union C.I. during the Admit / Bravo shift where the plaintiff was confined.

Plaintiff filed two grievance reports to Defendant Hicks complaining that defendants Swain and Sloan threatened plaintiff, and also planned to force plaintiff out of his cell and take him into the hallway in V dormitory.

In his grievance plaintiff stated that this hallway is a "blind spot," ie., having no cameras, nor easily within witnesses view, and that in such area

Statement of Facts, continued:

defendants Swain and Sloan threatened to then physically abuse plaintiff to death, explaining that plaintiff's injuries were self inflicted.

On July 16, 2007 Defendant Hicks responded by approving plaintiff's first grievance report on the standpoint that the Office of the Inspector General would be given the case to investigate.

However, Defendant Hicks failed to reasonably respond to plaintiff's request in his grievance report for help to be removed from the dangerous environment. Defendant Hicks was deliberately indifferent when he learned of plaintiff's peril, having access to numerous reports by inmates of abuse by Defendants Swain or Sloan. Defendant Hicks failed to remove plaintiff from the obvious danger.

Furthermore, plaintiff's second grievance report to Defendant Hicks complained about Defendant Swain, particularly, on his masterminding role in the plan for the future scheduled assault on plaintiff in the hallway.

Plaintiff filed it prior to Defendant Hicks approving plaintiff's first grievance. Yet, Defendant Hicks again failed to reasonably respond to the obvious danger by denying plaintiff's second grievance upon the erroneous claim that the second grievance was filed after Defendant Hicks responded to the first grievance. The date of filing the second grievance was before the date Defendant Hicks signed his response to plaintiff's first grievance.

Defendant Hicks had access to numerous reports of physical force and abuse against inmates in "blind spots" such as hallways. And though Defendant Hicks intended to respond that the Office of the Inspector General would investigate plaintiff's case, it was still well within Defendant Hicks authority and obligation to remove plaintiff from the obvious danger of abusive security staff even during the investigation by the Office of the Inspector General.

9C

Statement of Facts, continued:

Defendant Hicks' failure to reasonably respond to the obvious risk of serious harm to death to plaintiff resulted in plaintiff being severely injured. As a direct result of Defendant Hicks' failure to protect, plaintiff was severely injured by Defendants Swain and Sloan and Doe (Jill) approximately nine days after Defendant Hicks responded to plaintiff's grievance about their threats.

On July 24, 2007 in wing two of V dormitory at Union C.I. during the morning hours of the Bravo shift Defendant Swain ordered plaintiff to submit to Defendant Sloan's handrestraints. In absolute fear and terror of Defendants' Swain and Sloan threats earlier plaintiff hesitated and stalled, but then reluctantly submitted to Defendant Sloan handcuffing plaintiff behind his back through the handcuff port on plaintiff's celldoor.

After plaintiff's celldoor was opened Defendant Sloan had shackles placed on plaintiff's feet. Defendant Swain then directed Defendant Sloan and Defendant Doe (Jill) to drag plaintiff out to the hallway and beat up plaintiff.

At this time plaintiff froze in fear while Defendant Sloan forcefully grabbed plaintiff's right arm, Defendant Doe (Jill) forcefully grabbed plaintiff's left arm, and both Defendants Sloan and Doe (Jill) lifted plaintiff up and rushed him out of wing two into the hallway, followed by other officers, including Officer Thornton (First name unknown) and Defendant Swain.

Moving quickly while rushing plaintiff, Defendants Sloan and Doe (Jill) then violently rammed plaintiff's head into the iron grille gate located at the head of the hallway near the medical treatment area and holding cells. Just prior to losing consciousness, plaintiff experienced an intense pain in his head and neck as blood poured out his head. Plaintiff was overcome by a very real sense of terror, dread, and a thought that he would be killed. Plaintiff then lost consciousness.

9D

Statement of Facts, continued:

Defendants' Sloan and Doe (Jill) use of force was excessive and unnecessary to maintain discipline. Instead their actions were malicious and meant to cause the plaintiff serious, unreasonable harm.

After plaintiff regained consciousness he was dragged over to a holding cell where Defendant Sloan violently punched plaintiff's face and kicked plaintiff's with Officer Thornton administering violent blows also. Defendant Sloan's assault persisted until plaintiff again lost consciousness.

When plaintiff regained consciousness again he faintly noticed Defendant Swain ordering the blood to be cleaned up quickly. He then reminded plaintiff of the consequences of further grievances on him or his officers. Defendant Swain then kicked plaintiff in the head squarely and strongly just prior to the portable use of force camcorder being brought to record the medical assessment and treatment of plaintiff's injuries and the return of plaintiff to his cell. Defendant Swain's assault caused plaintiff to lose consciousness again after causing excruciating pain to his ear.

Plaintiff was unable to walk due to, what plaintiff believed was, a neck and leg injury. After initial medical assessment by nurse in V-dormitory plaintiff was placed in a neck brace, then strapped onto a stretcher before being rolled to U.C.A. to receive stitches to the laceration on his head.

Medical staff at U.C.A. asked what caused the injuries. But plaintiff's jaw was swollen and injured so he was unable to easily talk. In the background of the U.C.A. infirmary stood Defendant Swain and signaled plaintiff not to describe what happened to him.

Concerned about further retaliation by removing property and legal work from plaintiff's cell, plaintiff managed to mumble to Defendant Swain on the issue, who replied if plaintiff did not snitch, plaintiff could keep all his property and legal work.

9-E

Statement of Facts, continued:

From the UCA infirmary at Union C.I. plaintiff remained stretcher-bound, and was transported to the Reception and Medical Center (R.M.C.) in Lake Butler, Florida. There, plaintiff received X-rays and the doctor ordered him to receive a liquid diet due to the injury to plaintiff's jaw making him unable to open his mouth adequately enough to eat solid foods.

When plaintiff returned to V-dormitory at Union C.I, Defendant Swain escorted plaintiff to his cell. Though incident reports on the July 24, 2007 incident were available to Defendant Hicks, he still failed to remove plaintiff from future danger in V dormitory after plaintiff's grievances of detailed threats materialized merely nine days later.

Days after the July 24, 2007 assaults, Defendant Swain entered wing 2 in V dormitory and approached plaintiff with a Voluntary Statement Form concerning the July 24, 2007 incident. Defendant Swain reminded the plaintiff not to "snitch" if he wished to keep his property and legal work in his cell.

Plaintiff did not sign the section designated for refusing to make a statement. Instead, plaintiff left the Voluntary Statement space blank, yet signed the Voluntary Statement section with the name: "Scary Cat", hoping to gain an investigator's attention that plaintiff wanted to make a voluntary statement, but was too intimidated to make a voluntary written statement.

And this was the beginning of a campaign of harassment directed by Defendant Swain, involving numerous staff members at Union C.I.

Finally, plaintiff began to file his initial grievances concerning his abuse on July 24, 2007. However, responses to these initial grievances post-July 24, 2007 were never received by plaintiff.

9F

Statement of Facts, continued:

However, plaintiff continued to file grievance reports to Defendant Hicks concerning the heightened danger plaintiff faced due to his grievances against security. Plaintiff further grieved against the interference of his access to alternative treatment with mental health staff. Again, plaintiff sought relocation to safer environs, as an appropriate grievance remedy. Yet, Defendant Hicks neither relocated plaintiff, nor had him interviewed about his complaints.

Defendants' Swain and Sloan began to tell plaintiff that all his grievances would be intercepted and advised that he'd arrange for all of plaintiff's property and legal work to be destroyed.

Defendant, Mr. David Braden is a Correctional Officer of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank and was assigned to Union C.I. during the Bravo shift where the plaintiff was confined.

Then Defendant Braden brought all plaintiff's property, legal work, and copies of filed grievances from property room storage. He delivered the plaintiff's property to an inmate on the top tier. The inmate signed his own name and P.C. number on the property receipt form which listed the inventory of plaintiff's personal property.

When Defendant Braden was advised of the error, he told the inmate to throw plaintiff's property away because Defendant Swain wanted all of plaintiff's property to be destroyed, and that Defendant Braden would scratch the inmate's signature on the property receipt later and write plaintiff's information in its place, so the inmate would get into no trouble.

Plaintiff only managed to convince the inmate to return a couple of tattered and empty envelopes. The inmate did not return the rest of plaintiff's property.

9G

Statement of Facts, continued:

Afterwards, plaintiff filed a grievance on the issue. In response, Correctional Lieutenant Mr. K. Butler (First name unknown) stated that the property receipt indicated that plaintiff's signature was signed and that Defendant Braden denied doing any misconduct.

Upon later inspection of the property receipt plaintiff received, the inmate's signature and D.C. number was poorly crossed out and plaintiff's name and D.C. number was forged at the top of it. Defendant Braden's dated signature on the receipt indicated he was the official who delivered the property belonging to plaintiff to another inmate.

Plaintiff attached the copy of the property receipt to his final appeal to Central Office. However, plaintiff never received a response or the appeal and property receipt after filing it.

Defendant Braden deliberately deprived plaintiff of his property for no just reason, and as part of the campaign of harassment directed by Defendant Swain to obstruct plaintiff's access to the grievance process and to the ultimate filing of his civil rights complaint by including copies of his grievances to his complaint.

Still, plaintiff continued to file grievances related to the campaign of harassment and abuse. And still, some of these grievances came up missing after plaintiff placed them in the grievance box.

When Defendant Hicks visited wing two in V dormitory, plaintiff asked him about his failure to ensure plaintiff's safety from obvious danger by removing plaintiff from V dormitory.

Defendant Hicks responded that plaintiff got what he deserved for seeking trouble by filing grievances on security staff that Defendant Hicks

4H

Statement of Facts, continued :

had no intention to go against, regardless of their wrongdoing.

Plaintiff filed grievance to challenge Defendant Hicks' bias, but any complete resolution to plaintiff's complaint was again blocked.

When plaintiff's classification officer at that time, Mr. Clayton E. Smith, paid a visit to wing two in V dormitory, plaintiff advised him of plaintiff's life being in danger and requested Mr. Smith's assistance. But Mr. Smith suggested that plaintiff pray because Mr. Smith was formerly a Correctional Sergeant and therefore, was unwilling to make any moves against security staff.

Against Mr. Smith's bias plaintiff filed Informal and Formal grievances; both were denied. His appeal met the same fate.

And though the campaign of harassment and abuse persisted, Defendant Hicks still deliberately refused to remove plaintiff from the obvious danger.

Feeling mentally overwhelmed and overburdened to the point that plaintiff seriously contemplated suicide as a welcome alternative to the harassment and abuse by defendant Swain, et al., which Defendant Hicks refused to remove and safeguard plaintiff from, plaintiff attempted to get help from officials outside of Union C.I.

Plaintiff wrote a long letter detailing the harassment and abuse from staff at Union C.I. since the middle of 2007, how Defendant Hicks and others' failure to protect plaintiff is driving him to the brink of suicide. Plaintiff caused copies of this letter to be mailed to the Florida Attorney General, the Florida Governor, the Secretary of Florida Department of Corrections, the Inspector General of the Florida Department of Corrections, the Federal Bureau of Investigation via the United States Department of Justice - Civil Rights Division and Defendant Hicks, asking for their help.

9-I

Statement of Facts, continued :

Shortly thereafter, Union C.I. officials were contacted and advised of plaintiff's letter and, upon information and belief, also advised on the need to address plaintiff's thoughts of suicide.

Plaintiff was relocated to an Isolation Management Room while he was evaluated on Self Harm Observation Status by mental health staff. The property, legal work, and the accumulation of copies of grievances and responses were taken from plaintiff by Officer Thornton while on suicide watch and inventoried for storage in the property room.

Defendant Swain and Officer Thornton warned plaintiff they intended to discard plaintiff's property but would wait until a better opportunity when plaintiff's "watchdogs aren't watching".

Plaintiff's grievance to this threat was laid to rest by the response that ensured plaintiff's property was safely stored in the property room.

After repeated evaluations by mental health staff plaintiff was discharged from Self Harm Observation Status, and eventually received his property. In response to copies of plaintiff's letter mailed abroad, he was contacted by the Florida Attorney General and Florida Governor in writing.

Plaintiff was advised that a copy of his letter was provided to the Office of the Inspector General, Defendant, Mr. Paul C. Decker, who, himself is the Inspector General within the Florida Department of Corrections. Defendant Decker is legally responsible for the overall operation of investigations of the Department and each institution under its jurisdiction, including Union C.I. where the plaintiff is confined.

Plaintiff was also advised in the response that all complaints on the subject should be forwarded directly to Defendant Decker. Also stated in the re-

9-J

Statement of Facts, continued:

sponse was instructions to Defendant Decker who, upon information and belief, received copy of response to plaintiff, directing him to investigate the complaints and issues in plaintiff's letter.

But the Office of the Inspector General, headed by Defendant Decker was already made completely aware of the obvious danger since the middle of 2007 by many of plaintiff's grievances. The current notice for Defendant Decker to investigate plaintiff's complaints was only made after previous notices were not reasonably responded to.

Yet, even with the current notice to Defendant Decker, the Office of the Inspector General still refused to visit, interview, remove or protect the plaintiff from obvious danger, constant harassment and abuse which caused plaintiff extreme anxiety and stress and an inability to gain access to alternate mental health treatment which was necessary to help meet the serious mental health needs of countering his mental disability and illness, unto November 26, 2007.

On November 26, 2007 plaintiff was still confined to wing 2 of V dormitory, in cell # V2-201 during the morning hours of the Bravo shift. Defendant Swain ordered plaintiff to submit to handcuffs, yet plaintiff hesitated to comply until he packed all his property into his white pillow case first.

Because of Defendant Swain's and Officer Thornton's threats earlier, to destroy plaintiff's property at later time, plaintiff sought to secure his legal work, legal mail, copies of grievances and responses, etc. which had accumulated since Defendant Braden destroyed plaintiff's property by an inmate on an earlier date.

By the time plaintiff finished packing his property Defendant Swain had gathered a team of five correctional officers, completely clad in black riot gear,

9K

Statement of Facts, continued:

including helmets, body armor and shield to use physical force if plaintiff refused to be handcuffed and exit his cell. Along with them was an officer operating a portable camcorder to videotape the anticipated use of force.

Plaintiff did not resist. He submitted to being handcuffed behind his back. As soon as shackles were placed on plaintiff, Defendant Swain announced that plaintiff had been secured with restraints without force being used, and that the recording of the cell extraction would now cease. Then the camera operator stopped the videotape recording on the portable camcorder.

At that moment, while plaintiff still stood in front of his cell on the second tier Defendant Swain ordered plaintiff to walk off wing two into the hallway so plaintiff could be beaten up in location where neither witnesses or cameras were present. Defendant Swain ordered plaintiff to leave behind the pillowcase containing property that plaintiff sought to bring with him.

Terrified with fear, plaintiff slowly approached and descended the stairs towards the dayroom floor. As plaintiff got closer to the dreaded hallway, plaintiff's knees began to shake and buck as he was sorely afraid. Plaintiff seemed to notice his heart beat accelerating. He knew how he was seriously injured just months ago in that same hallway at Defendant Swain's order for plaintiff's grievances, and plaintiff anticipated worse would happen to him in that hallway by Defendant Swain and his officers in riot gear for filing more grievances.

Defendant Swain told Defendant, Mr. Napier (First name unknown) to take plaintiff's property and destroy it. Defendant Napier is a Correctional Sergeant of the Florida Department of Corrections, who, at all times that are related and mentioned in this complaint, held this same rank, and was assigned to the Bravo shift at Union Correctional Institution where the plaintiff was confined. During the time of this incident on November 26, 2007, he was Bravo shift supervisor in V dormitory.

9L

Statement of Facts, continued:

Defendant Swain ordered plaintiff to continue walking toward the hallway but plaintiff's legs were paralyzed by his great fear. The camera operator was standing only feet away holding the camcorder that, by Defendant Swain's order, had already been turned off; apparently the camera operator remained nearby anticipating the use of force which would come should plaintiff fail to walk faster.

Again Defendant Swain ordered plaintiff to walk, but plaintiff's body could not overcome the terror that would not allow his steps to quicken. Defendant anticipated using force by plaintiff's apparent inability to walk beyond his sluggish movement, against Defendant Swain's repeated orders to speed up. Yet, Defendant Swain did not order the camera operator to restart the camcorder's recording in anticipation of a use of force.

Instead, Defendant Swain ordered the officers clad in riot gear to slam plaintiff into the floor. At this time Defendant, Mr. Jerry Davis told plaintiff that he was a "dead nigger", and forcefully grabbed plaintiff's neck while plaintiff was roughly picked up into the air and violently smashed into the concrete dayroom floor with such force that plaintiff's prescription eyeglasses broke on his face and plaintiff suffered an injury on the left side of the face, spilling a puddle of blood. This force was meant to cause harm and did not help motivate him to walk faster, but injured him beyond the point of being able to walk.

Defendant, Mr. Jerry Davis is a Correctional Officer of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank and was assigned to the Bravo shift at Union Correctional Institution, where the plaintiff was confined. Defendant Davis worked in U dormitory on November 26, 2007.

After plaintiff was injured, Defendant Swain ordered the camera operator

Statement of Facts, continued:

to restart the camcorder recording. Plaintiff bled profusively from his head injury. Plaintiff was dragged or carried to the medical treatment area in V dormitory. The camera operator stood outside the nurse's office and recorded plaintiff being treated by Nurse Hutchinson (First name unknown), holding the portable camcorder at the window of the closed treatment room door.

Nurse Hutchinson unsuccessfully attempted to stop plaintiff's head injury from bleeding. She then advised Defendant Swain that plaintiff needed stitches, but Defendant Swain rejected her findings. Nurse Hutchinson then told Defendant Swain that plaintiff's head injury must be re-assessed immediately upon arrival to U dormitory by U dorm Nurse, Ms. Grunthum (First name unknown).

Defendant Swain then ordered plaintiff to stand up but plaintiff was unable to because the loss of so much blood made him faint and increasingly weak. At that moment, Defendant Swain ordered for plaintiff to be carried out of V dormitory and over to U dormitory.

Plaintiff was then picked up by his legs and the part of his jacket near his neck and carried to U dormitory, leaving a trail of blood from his head injury the entire way. Plaintiff was strangled while the officers carried him by his jacket collar which cut off much of his oxygen and resulted in him losing consciousness in U dormitory.

Defendant Swain did not take plaintiff to Nurse Grunthum, as Nurse Hutchinson instructed. Instead, he took plaintiff to wing 4 of U dormitory where the barely conscious plaintiff was thrown into a cell. The officers hooked one end of a safety cord to plaintiff's handcuffs, holding the other end through the cuffport and shut the door before violently snatching plaintiff's wrists to the handcuff port by the safety chain to remove the handcuffs. Plaintiff

9N

Statement of Facts, continued :

was placed in a cell devoid of a mattress, linen, toilet tissue, working sink or toilet, and with clothes on covered with the blood from his head injury that continued bleeding because it received inadequate medical treatment.

After perhaps an hour since being placed in that cell plaintiff regained some strenth. Plaintiff noticed that his ill treated head injury was bleeding still. Plaintiff began to use what little means he had to alert medical staff who plaintiff believed might be a distance beyond the wing's closed door.

Defendant Swain entered wing four of U dormitory and threatened plaintiff with more abuse if he kept trying to alert medical staff. Plaintiff continued to try anyway. Defendant Swain returned again, advising plaintiff he must submit to handrestraints to be taken into the hallway. He told plaintiff he had Nurse Grunthum secure an order from the psychiatrist for plaintiff to receive an E.T.O. injection of psychotropic medication.

Defendant Swain told plaintiff that after he receives the injection plaintiff would be assaulted again, in the hallway to teach plaintiff a lesson against trying to "snitch" on him. Afraid for his safety, plaintiff refused to let Defendant Swain escort him.

During that same Bravo shift, on November 26, 2007, Defendant Swain told plaintiff that he was moved to U dormitory because Defendant Swain was the Officer in Charge in U dormitory, there on the Bravo shift yet controlling by influence all three shifts. Defendant Swain threatened to use this convenience to harass and abuse plaintiff as a means to stop plaintiff from making grievances or complaints against him.

Correctional Lieutenant, Mr. K. Butler arrived with a camera operator and a portable camcorder to escort plaintiff to Nurse Grunthum. She administered the injection and also additional medical treatment after seeing that it was not properly treated and still was bleeding.

Returning to wing four of U dormitory after leaving Nurse Grunthum, plaintiff

40

Statement of Facts, continued:

was relocated to cell # U4-101 which is located in the far corner. Defendant Swain advised plaintiff that he had Defendant Napier throw away all of plaintiff's property from wing two in V dormitory and also, that plaintiff's relocation to this corner cell would prove difficult for the wall mounted fixed position surveillance cameras to record the upcoming abuse planned to occur very soon against plaintiff's "snitching."

No property receipt was delivered to plaintiff to document that the property left in wing two of V dormitory was ever inventoried to the property room, because Defendant Swain told Defendant Napier to throw plaintiff's property away.

Plaintiff filed timely grievances within days of November 26, 2007, against the abuse directed by Defendant Swain in retaliation for plaintiff's previous grievances. Plaintiff also grieved how Defendant Swain caused plaintiff's property to be destroyed by Defendant Napier to deprive plaintiff of his legal work, copies of grievances and responses required to file suit, and other effects, most of which was related to preparing plaintiff's case against Defendant Swain's campaign of harassment and abuse against plaintiff.

In addition to these complaints plaintiff also notified Defendant Hicks in his grievance that Defendant Swain arranged a plan to abuse plaintiff very soon as reprisal against plaintiff's grievances, and to take advantage of the corner cell he put plaintiff in which the fixed position cameras would find difficult to record.

Plaintiff complained that his life was in danger, and he was in fear of this present danger which plaintiff sought protection from. Yet, Defendant Hicks made no reasonable effort to protect plaintiff from the obvious danger brought to his attention.

Defendant Napier was occasionally assigned as Bravo shift supervisor in U dormitory. Plaintiff questioned him and an inmate Mr. Mark Lang, who was present in wing two of V dormitory on November 26, 2007, about plaintiff's missing property.

Plaintiff learned, upon information and belief, that Defendant Napier did delib-

Statement of Facts, continued:

erately misplace plaintiff's property as directed by Defendant Swain. Plaintiff's grievance about his lost property claimed in response that the property was returned. But plaintiff never received the property back that Defendant Napier took, nor does there exist a receipt where plaintiff signed after he would have received the property. To date, the property is still missing.

On December 5, 2007, during the Bravo shift a number of security staff entered wing four of U dormitory with Defendant Swain. Plaintiff was still confined in the corner cell # U4-101 at this time. Defendant, Mr. Harper (First name unknown) approached plaintiff's cell, conducted a strip-clothes search, and ordered plaintiff to submit to handrestraints.

When plaintiff surrendered his hands to be handcuffed Defendant Harper quickly grabbed plaintiff's arms and began yanking, pulling, bending and kicking them while threatening plaintiff for filing grievances against Defendant Swain.

Defendant, Mr. Harper is a Correctional Sergeant of the Florida Department of Corrections who, at all related times mentioned in this complaint, held this same rank during the Bravo shift and was assigned at Union C.I. where plaintiff was confined.

A camera operating officer then arrived with a portable use of force camcorder, and plaintiff was escorted to the nurse to conduct a post use of force physical in the company of Defendant Swain; Correctional Captain, Mr. J.R. Fell (First name unknown); and others.

As soon as plaintiff was returned to his cell, handcuffs removed and the portable camcorder turned off, Defendant Swain ordered plaintiff to re-submit to handrestraints to be removed from his cell again so his cell could be searched and so plaintiff could be taken into the hallway again, this time to be searched and then beaten without the presence of a portable camcorder recording this time.

Statement of Facts, continued:

Plaintiff was terrified, but was afraid to resist because Defendant Swain already told him corner cells like this one could barely be seen by the wall mounted cameras and plaintiff did not wish to be brutally beaten like inmate Kieth Carpentier was by Defendants Swain, Sloan and others when Mr. Carpentier was in V2-101, which is a far corner cell just like the one plaintiff was in.

To avoid giving Defendant Swain a reason to just open plaintiff's cell door and all of them beat him up and be justified since plaintiff would be uncuffed, plaintiff reluctantly complied to handrestraints and exited his cell.

Defendant Swain's threats put plaintiff in grave fear. As he slowly proceeded towards the hallway, a group of officers and Defendant Swain surrounded him. After a brief pause to get plaintiff's bearings, Defendant Swain ordered the officers to grab plaintiff, carry him out into the hallway storage room and assault him.

The group of officers then violently grabbed and dragged plaintiff out into the hallway storage room where plaintiff was punched, kicked and slapped and choked in the head, neck, face, and body by Defendants' Swain, Davis and Harper, along with the abusive Defendant, Mr. Robinson (First name unknown) and Defendant, Mr. Walker (First name unknown). During this attack plaintiff was sexually assaulted by digital penetration. Plaintiff suffered bruised eye, rectal pain, and upper, lower body, facial pains.

Defendant, Mr. Robinson is a Correctional Sergeant and Defendant, Mr. Walker is a Correctional Officer, both of the Florida Department of Corrections and both, who at all related times mentioned in this complaint, held this same rank during the Bravo shift at Union C.I. where plaintiff was confined. Defendant Walker was assigned to U dormitory on December 5, 2007.

This abuse occurred while Correctional Captain, Mr. J.R. Fell stood outside the partially closed storage room door hearing my cries for help, but not intervening.

4R

Statement of Facts, continued:

However, the assault against plaintiff ended when Defendant Braden arrived, dragging inmate Manuel Alvarez into the storage room and began beating him up.

There are no surveillance security cameras in the hallway area of U dormitory. Defendant Swain warned plaintiff not to complain of any abuse or injury once the portable use of force camcorder was turned on. He told plaintiff that if any complaints were made once the recording began, he would have the tape turned off, assault plaintiff again until he cooperated and turn a new recording tape on.

Plaintiff promised to comply. Co. Capt. Fell told Defendant Braden to cease his assault on inmate Mr. Alvarez so the recording could begin on plaintiff's post use of force physical where the dragging of plaintiff off wing four was mentioned, but the actual assaults in the hallway storage room were never acknowledged. Plaintiff did however, file grievances and a written statement once back in his cell.

After the December 5, 2007 assaults plaintiff filed an American with Disabilities complaint to Union C.I. during December, 2007. Plaintiff explained how he was mentally disabled, yet his serious mental health needs and treatment were being denied due to threats and abuse by security staff which mental health staff failed to adequately intercede.

In his A.D.A. complaint plaintiff sought relocation to a different location where his access to mental health treatment programs would not be hindered. However, plaintiff concluded his complaint was not acknowledged, or possibly intercepted because he never received a response to his A.D.A. complaint.

Because other inmates were reportedly abused on the Bravo shift of December 5, 2007 from wing four of U dormitory, a large number of grievances were filed, along with letters to the governor of Florida about Defendant Swain and his officers abuse against the inmates. Plaintiff filed over twenty himself, and more for other inmates.

95

Statement of Facts, continued :

Defendant Swain told plaintiff that he was being watched due to all the sudden grievances and complaints filed. He told plaintiff he knew that plaintiff was filing for other inmates besides himself, and that Defendant Swain would arrange for an inmate to assault plaintiff, instead of an officer this time, if the plaintiff ever talks to an inspector about Defendant Swain.

Plaintiff quickly filed a grievance to Defendant Hicks about Defendant Swain's plans, But Defendant Hicks refused to protect plaintiff from the anticipated and obvious danger.

On or about December 20, 2007 a representative investigator from the Office of the Inspector General came and interviewed plaintiff for the very first time after about six months of grieving recurring abuses. The investigator began the interview on Charlie shift inside wing four of U dormitory for all inmates to see, but inside a glass walled room where the interview remained unheard.

Plaintiff explained, on tape, how Defendant Swain ordered and led the assault on December 5, 2007. Very shortly after the interview ended, showers and shaves began on Charlie shift for wing four of U dormitory, supervised by both Defendants, Mr. John Doe (Upon information and belief: possibly Mr. Gavrielle; first name unknown) who is a Correctional Sergeant, and Mr. Lee (First name unknown) who is a Correctional Officer.

Both Defendants Doe and Lee are of the Florida Department of Corrections and at all related times mentioned in this complaint, held their same rank while assigned to the Charlie shift in U dormitory at Union C.I. where plaintiff was confined.

Plaintiff was handcuffed behind his back and sent to the glass walled room where the inmate barber would shave him while plaintiff was seated. Though inmate Mr. Marvin Pace was on Self Harm Observation Status, he was handcuffed in the front.

Statement of Facts, continued:

Inmate Pace was let out of his cell. He then ran into the room where plaintiff was seated getting shaved, and physically assaulted and repeatedly punched plaintiff in his head. Defendants' Doe (Gavrielle) and Lee allowed the assault to occur and did not stop it, nor prevent it. Inmate Pace stopped on his own.

When Defendants' Doe (Gavrielle) and Lee entered the barber area, plaintiff was told that this was the consequence for snitching on Defendant Swain to the investigator earlier. Defendant Lee told plaintiff to refuse all medical treatment once he arrived to the medical treatment area in the hallway and to write no complaint or plaintiff would be beaten up again, in the hallway where no witness or camera could see.

Reluctantly, plaintiff complied, though he suffered a bruised eye, busted lip, and lumps on his head, along with aches and pain. Still, plaintiff did file grievance on the assault while safely in his cell.

Defendants' Doe (Gavrielle) and Lee knew or should have known that Inmate Pace did not have a front cuff pass, was on suicide watch, and was required to be handcuffed behind his back like all other inmates. It should have been obvious that plaintiff was put in serious danger or harm by allowing Inmate Pace to attack plaintiff.

Later, during the Bravo shift in U dormitory, plaintiff was ordered by Defendant Davis and Correctional Officer, Mr. Crews to submit to handrestraints. Plaintiff feared possible retaliation due to his grievances against Defendants' Swain and Davis.

Defendant Davis and Co. Ofc. Crews then grabbed and bent plaintiff's arms and fingers. Plaintiff's right middle finger was injured, swollen and causing plaintiff much pain which, to date, still persists. Plaintiff received X-rays for his finger and filed his grievances on the assault by Defendant Davis and Co. Ofc. Crews.

On various occasions plaintiff had been told by Defendant Swain and others that if plaintiff ever was transferred to Santa Rosa Correctional Institution

Statement of Facts, continued:

in order to escape, and be protected from, the abuse at Union C.I. there would be no problem getting officer buddies of theirs at Santa Rosa C.I. to continue the reign of terror against plaintiff akin to how the officers at Florida State Prison and Union C.I. rely on each other to handle inmates. Plaintiff repeatedly included this issue in his grievances to Defendant Hicks.

Plaintiff's copies of grievances and responses, sick call requests and response letters from the U.S. Dept. of Justice / F.B.I., Florida Governor, Florida Attorney General and other papers concerning plaintiff's abuse and his complaints that many grievances were intercepted or not responded to and the complaints on his property being taken, all remain missing as this stolen property contained all these papers and more that Defendant Swain and others took on different occasions and did not return to plaintiff yet.

Plaintiff was in T dormitory between February and March, 2008 when Defendant Braden approached plaintiff on Bravo shift with legal mail that he told plaintiff to sign for on the Incoming Legal Mail Log sheet. Plaintiff signed the Log and saw the name of a private law firm. Then Defendant Braden told plaintiff his status precluded him from receiving the legal mail. Plaintiff asked what would happen to the mail.

Defendant Braden replied he would hold it awhile before inventorying it to property in hopes to interfere with any litigation plaintiff planned with the law firm against him and his buddies. Plaintiff denied such plans. Defendant Braden said he believed plaintiff's many grievances filed in 2007 served as precursor to some suit plaintiff had been planning. Defendant Braden then left with plaintiff's legal mail.

Defendant Braden did not have plaintiff's legal mail inventoried into property until after an unusually extended period of time. Plaintiff filed grievance to argue Defendant Braden's proclamation, but received no response.

9V

Statement of Facts, continued:

Plaintiff was relocated to S dormitory on April 3, 2008. On or about April 25, 2008 plaintiff encountered Defendant Braden on the Bravo shift, in what resulted in a physical and sexual assault.

Plaintiff complained to the Bravo shift supervisor of S dormitory, a Correctional Sergeant, Mr. L. Crews (First name unknown) to no avail. Plaintiff's verbal complaints to Co. Sgt. Crews were relayed back to Defendant Braden, who vowed retaliation against plaintiff's grievances since 2007 against him, and now plaintiff's complaints which Defendant Braden threatened plaintiff with further assaults.

Resultingly, on May 6, 2008 plaintiff began to file series of grievances to Union C.I. explaining the danger, fear, injury and urgent need for protection. However, plaintiff was not protected, by Defendant Hicks.

Then, plaintiff began to file -mail letters to Florida Governor, Mr. Charlie Crist and the Inspector General, Defendant Decker explaining the threats, abuse, danger and need for protection. These correspondences to the Florida Governor and Defendant Decker began on May 27, 2008, June 2, 2008.

On numerous occasions plaintiff's grievances, since mid-2007, were referred to Defendant Decker at the Office of the Inspector General, to address plaintiff's concerns and the abuse on him. Defendant Decker was also notified by the Florida Governor to investigate abuse plaintiff brought to the attention of the Florida Governor.

Yet, Defendant Decker failed to reasonably respond in order to protect plaintiff with safety. In fact, though plaintiff repeatedly grieved the Office of Inspector General, Defendant Decker's failure to protect and how such failure placed plaintiff in jeopardy of serious physical injury, Defendant Decker waited approximately five months before an investigator from his office interviewed plaintiff about the abuses. Plaintiff was injured physically, psychologically by constant abuse and harassment that Defendant Decker ignored too long.

9W

*Statement of Facts, continued:*

The risk of serious physical injury and harassment has increased. The officers in S-dormitory walk by see plaintiff working on his complaint. Plaintiff once caught a Co. Sgt. in his cell reading his complaint. And plaintiff still is filing grievances, which by itself places him at great risk.

On May 21, 2008 Co. Sgt. Randall Wheeler began harassing plaintiff on behalf of defendant Brader and because of plaintiff's problems with this Co. Sgt. in 2006, which plaintiff filed against him then, in 2006.

He read my mail, promised to steal all future mail and with the help of Co. Ofcs. ████████ Shearer and Johnson is coming very, very close to getting plaintiff in area to physically abuse him.

Plaintiff grieved this, but defendant Brader picks up grievances and told plaintiff the contents of his own grievances, indicating he's interfering.

Co. Sgt. Wheeler, et al. on the Charlie shift of S-dorm is very dangerous. He has beaten up inmates before. I personally witnessed some of the other officers, on the Charlie shift assault or abuse inmates, so plaintiff believes their threats are as real as the Bravo shift guards threats.

Plaintiff is afraid to accept dinner meals - Charlie shift because these guards already threatened to flip his food tray and place plaintiff on a management meal. So plaintiff cannot accept his medication for fear he'd be accused of attempted assault and be forced out his cell and be beaten up. And he cannot eat dinner anymore because allowing his food flap to open will give the officers a chance to set up and then harm plaintiff on behalf of defendant Brader. And close interaction with officers during escort to shower and shave prohibits plaintiff from that due to the high risk of serious injury such interaction poses. Plaintiff is in a very hostile condition where inmates who write the wrong type of grievances are beaten up or abused.

9-X

Statement of Facts, continued:

On May 20, 2008 during the Charlie shift, Co. Sgt. Randall Wheeler passed inmate's mail out on wing 3 of S-dormitory, where plaintiff is confined to cell S3-107. He fabricated a story of incest between plaintiff and his father he claimed the letter in plaintiff's mail contained, igniting controversy against inmates within earshot against plaintiff. Sgt. Wheeler said he was harassing plaintiff because his 2006 conflict with plaintiff was rekindled since plaintiff began filing grievances on Officers like Defendant Braden, who he is fond of. Plaintiff grieved this to Defendant Hicks.

Plaintiff was denied his dinner meal while Sgt. Wheeler worked, from May 21-24, 2008. Plaintiff filed grievances on it to Defendant Hicks. Plaintiff is continuously taunted by the guards threats, especially when they observe plaintiff preparing his grievances or civil rights complaint, other civil motions.

Sgt. Wheeler passed mail out again, on May 23, 2008. He gave plaintiff his mail. After looking through it, plaintiff saw a book of postage stamps from his father was missing and three and three research material items were missing that the Law Library claimed they sent.

But on March 25, 2008, Law Library advised plaintiff, in Exhibit B, that he could not receive requested research material because the 17 research items that the guards seized and failed to return, plaintiff could not return to Law Library.

So, on May 14, 2008, plaintiff sent request to the Law Librarian, Mr. Peterson which he responded to on May 20, 2008 and plaintiff received on May 23, 2008. In Exhibit C, it shows this request.

Plaintiff's access to the Law Library, and thus, the courts had been hindered simply because plaintiff was unable to return material to the Law Library that the officers took and would not admit guilt and confirm plaintiff's allegation.

Plaintiff filed grievance to Defendant Hicks about the denial of this access.

When Sgt. Wheeler did not work, on May 25, 2008, Co. Officer, Mr. T. Shearer

*Statement of Facts, continued:*

refused to feed plaintiff; which, on May 27, 2008 plaintiff filed grievance on to Defendant Hicks.

Notwithstanding the imminent risk of serious injury to plaintiff, he has been denied opportunity to make copies of his civil rights complaint, etc. though he sought copies by written request to Law Library and verbal request to Co. Sgt. L. Crews and his officers on Bravo shift in S-dormitory.

Exhibits of relevant rules of the Florida Dept. of Corrections could not be obtained to support plaintiff's complaint due to current restrictions on plaintiff's access to research materials from Law Library.

Exhibits of numerous grievances by plaintiff in 2006-2008 could not be obtained from property guards seized and failed to return.

Declarations by Nurse Hutchinson (First name unknown), who witnessed July 24, 2007 abuse and November 26, 2007 injuries, could not be obtained since she is not available at plaintiff's location.

Declarations by Mrs. Bartholomew (First name unknown) on plaintiff's initial participation in therapy ceasing and why, were not obtainable since this counselor, upon information and belief, stopped counselling wing 1 of V dormitory since late 2007 after witnessing officers physically abuse an inmate.

Declarations by Union C.I. inmates': Craig Justin regarding the July 24, 2007 incidents Mark Lang about defendant Napier taking plaintiff's property on November 26, 2007, and abuses by defendant Swain; Mark Williams about abuses by defendant Sloan; Marvin Pace and Salvatore Sicari about seperate abuses by defendant Swain; Kieth Carpentier about defendant Swain's abuses; Manuel Alvarez about defendant Braden's abuses; Pierre Turogene and Tyrone Mosley about defendants various abuses in U dorm; Phillip Daughtry about defendants' abuses in U and V dorms; Nathan Siefert and Antonio Jones about Ofc. T. Shearer's abuses and Mr. Jones' abuse on          May 12, 2008 by Bravo shift guards.

Statement of Facts, continued:

On May 21, 2008 plaintiff submitted Informal Grievance, Log # 05-2008-299 to complain about his access to the Law Library and the courts being denied. On May 30, 2008, the Law Librarian approved plaintiff's grievance, reinstating plaintiff's access to research material.

However, in Exhibit D, Union C.I.'s Law Librarian refused to provide plaintiff with copies of his complaint to mail the Clerk as required for each defendant... without plaintiff first being provided a court order to file more. Thus, plaintiff could only file the original complaint and cannot provide copies at this time.

On May 25, 2008 when Co. Ofc. Thompson R. Shearer (STR19) didn't feed plaintiff, he justified it by writing plaintiff a disciplinary report for disobeying order, Log # 213-081444, where he said plaintiff was ordered to back away from his food flap so it could be opened and a tray placed inside.

Ofc. Shearer said plaintiff refused to back away so plaintiff could not be fed. But all the other days, plaintiff was denied his dinner, no d.r. was written to justify it and never was another inmate ordered to back away, only the plaintiff.

On May 26, 2008 both Ofcs. Shearer, Johnson and Sgt. Wheeler did not work, so plaintiff was fed dinner.

But when Sgt. Wheeler and Ofc. Johnson returned to work on May 27, 2008, plaintiff was approached by Sgt. Wheeler who told plaintiff that he heard from the Bravo shift that plaintiff sent a civil rights complaint out to Law Library and that Sgt. Wheeler should arrange for plaintiff to be beaten and remove all his property and legal material        so he would have a hard

9-Z-1

Statement of Facts continued:

time filing his complaint once it returned. Again, on May 27, 2008, plaintiff was not fed dinner and Defendant, Randall Wheeler and Defendant, Sean J. Johnson began to threaten to physically abuse, sexually abuse plaintiff, calling him racially demeaning names like "black bitch" and "nigger sissy."

Plaintiff had already filed grievances to Defendant Hicks about the imminent risk of serious injury plaintiff faced under Defendant Wheeler but, Defendant Hicks failed to reasonably respond.

At approximately 8:40 PM, on May 27, 2008, Defendants Newell, Wheeler and Johnson removed plaintiff from his cell. While plaintiff was handcuffed behind his back standing against the wall, Defendant Newell began threatening plaintiff with physical and sexual abuse while Defendants Wheeler and Johnson cut off plaintiff's clothes in front of the other inmates.

During this clothes strip which the hallway wing fixed position cameras caught, plaintiff was called racially derogatory names by the trio.

Then Defendants Wheeler and Johnson entered plaintiff's cell and ripped his mattress, took all of plaintiff's property; including his notes, grievances, Local Rules of the Middle District and especially, his Jailhouse Lawyer's Handbook (a how-to §1983 guide) and removed it and everything else from plaintiff's cell.

Then, plaintiff was put into the cell where defendants Newell, Wheeler, and Johnson physically abused plaintiff and striking him with metal objects until plaintiff lost consciousness. They kept calling plaintiff racial slurs, telling him to stop filing grievances as they punched, kicked, choked, etc. plaintiff, making him scream, cry, and be filled with pain and fear.

9-Z-2

Statement of Facts, continued:

Regaining consciousness, plaintiff was made to come to the celldoor and after it shut, let the handcuffs be removed. Seeing he was bleeding from his head, plaintiff requested and was denied medical attention.

Plaintiff's left wrist was done first by Defendant Johnson, so plaintiff reached his left hand up to wipe the blood from his face on his left hand and reached his left hand out the flap so the fixed position cameras could see the blood.

Plaintiff did this while defendant Johnson was removing the cuff from plaintiff's right wrist. And at that time the trio advanced at plaintiff's revealing, bloody left hand which was then secured by physical force back in the flap.

The trio did not report a use of force, their abuse or plaintiff's injuries. But plaintiff's blood may have been recorded by the fixed position cameras.

Later, defendant Wheeler returned with a bunch of plaintiff's returned grievances and his other mail, telling him he could not file a complaint because he couldn't exhaust his remedies since defendant Wheeler would not give him his returned grievances to appeal.

Plaintiff suffered two head wounds, one neck wound and an undetermined injury to his butt which gave plaintiff much pain. He was found to have a low blood pressure, lethargic and was treated at the Urgent Care Annex (U.C.A.) hours after the attack, on the Charlie shift.

On May 28, 2008, Ofc. Thompson Shearer told plaintiff to back away from his door at dinnertime. Plaintiff complied. Ofc. Shearer threw plaintiff's dinner on the ground.

9-2-3

Statement of Facts, continued:

Though plaintiff suffered numerous injuries on May 27, 2008 plaintiff still is forced to sleep on a steel bed frame, without bedclothes, linen, or anything besides boxers and tee shirt continuously even unto June 2, 2008.

Plaintiff is continuously reminded by security staff that if he keeps filing grievances he will be abused and even worse if he files this complaint.

Plaintiff filed grievances to defendant Hicks about being abused AGAIN, on June 2, 2008.

1-2-4

VIII.   <u>RELIEF REQUESTED</u>:   State briefly what you want the Court to do for you.  Again, do not
make any legal arguments or cite any cases or statutes.

WHEREFORE, plaintiff respectfully prays that this Court enter judgement granting the plaintiff:

1)   A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

(Relief Requested, continued on page 10A)

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.**

Signed this _2nd_ day of _June_ , 2 _008_ .

Tyson Watson # , pro se plaintiff

Mr. Tyson N. Watson D.C.# 195947

Union Correctional Institution

7819 N.W. 228th. Street

(Signatures of all Plaintiffs)

Raiford, Florida 32026

DC 225 (Rev. 9/03)                                    10

Relief Requested, continued:

2) A preliminary and permanent injunction ordering Defendants Decker and Hicks to reasonably respond to plaintiff's threat of continuous serious injury by taking measures to ensure plaintiff's safety...
ordering Defendants Braden and Napier to make available or to return plaintiff's personal property back to him...
ordering the remaining Defendants to stop abusing and harassing plaintiff and refrain from any contact with plaintiff personally or by third party which may allow defendants to cause plaintiff to be abused or harassed...

3) An ████████████ Order restraining defendants from physically abusing plaintiff and causing plaintiff immediate and irreparable injury and restraining defendants from contacting plaintiff personally or by third party which may cause plaintiff immediate and irreparable injury.

4) Nominal damages against each defendant.

5) Compensatory damages in the amount of $ _____ against each defendant, jointly and severally.

6) Punitive damages in the amount of $ _____ against Defendants' Decker, Hicks, Swain, Sloan, Doe (Jill), Robinson, Harper, Davis, Walker, Newell, Wheeler and Johnson.

7) A jury trial on all issues triable by jury, including civil rights violation under Federal criminal law.

8) Plaintiff's costs in this suit.

9) Any additional relief this Court deems just, proper, and equitable.

10) Plaintiff be allowed to proceed in forma pauperis.

11) Plaintiff be appointed counsel.

10A